**Electronically Filed
Intermediate Court of Appeals
29623
30-JUN-2011
01:35 PM**

NO. 29623

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
BEN BALDADO, Defendant-Appellant.


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CR. NO. 06-1-0196K)


MEMORANDUM OPINION
(By: Nakamura, C.J., and Fujise and Leonard, JJ.)


Defendant-Appellant Ben Baldado (Baldado) was convicted of second degree murder, in violation of Hawaii Revised Statutes (HRS) § 707-701.5 (1993). The victim of the alleged murder was Jonah Mettler (Mettler). Mettler was last seen alive on August 26, 2003. On November 14, 2003, Mettler's body was found wrapped in a black material, under a mattress box spring, at a beach. He had three gunshots wounds to the head.

Baldado was found guilty after a jury trial and was sentenced to life imprisonment with the possibility of parole, subject to a mandatory minimum term of ten years. He appeals from the Judgment entered by the Circuit Court of the Third Circuit (Circuit Court).[1]

---

[1] The Honorable Elizabeth A. Strance presided over the proceedings relevant to this appeal.

On appeal, Baldado argues that his conviction must be vacated because the Circuit Court erred in: (1) allowing an alternate juror to replace a pregnant juror who became sick after the jury began deliberating, in violation of Hawai'i Rules of Penal Procedure (HRPP) Rule 24(c) (2000);[2] and (2) admitting into evidence recorded statements he made to a police detective who died before trial, in violation of his constitutional right of confrontation. For the reasons discussed below, we affirm Baldado's conviction.

BACKGROUND

I.

A.

The following evidence was adduced at trial. Baldado and Mettler knew each other, and they met and spoke at Mettler's house on the night of August 25, 2003. Mettler disappeared on August 26, 2003. Before leaving home early that morning, Mettler told his girlfriend that he had to take Baldado somewhere. According to the girlfriend, Mettler was using and selling "ice," and he constantly had drugs and money on him.

Baldado had been incarcerated in July 2003. Baldado's fellow inmates testified that Baldado said he was going to kill Mettler by shooting him when Baldado was released from incarceration. Baldado made arrangements with one inmate to purchase guns, and the inmate's sister testified that she had provided a rifle, wrapped in a towel, to Baldado. Other witnesses testified that shortly before Mettler disappeared, Baldado said he was going to shoot Mettler; Baldado was seen in possession of a rifle wrapped in a towel or blanket; and that

---

[2] HRPP Rule 24(c) provides, in relevant part:

**Alternate jurors.** The court may direct that not more than 4 jurors in addition to the regular jury be called and impaneled to sit as alternate jurors who shall, in the order in which they are called, replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict.

Baldado said he would be coming into possession of drugs and money.

After Mettler disappeared, his family began looking for him.  Mettler's Toyota truck was missing and someone was using the cell phone that Mettler's girlfriend had given to Mettler.  Mettler's mother was able to retrieve messages left on that phone, which included several left for "Ben."  On September 1, 2003, Mettler's mother, father, and brother saw Mettler's truck on the road heading toward Kawaihae.  They followed the truck until it stopped.  Mettler's mother called the police and Mettler's father and brother went to the truck.  Baldado was the driver and sole occupant of the truck, and he eventually admitted that the truck belonged to Mettler.  Baldado also had the cell phone that Mettler's girlfriend had given to Mettler.

When the police arrived, Baldado said that the truck's owner had gone to Oahu to pick up drugs and that Baldado was watching the truck for the owner.  Baldado agreed to give the truck to Mettler's parents, and he was not arrested at that time.

Witnesses testified that between the time of Mettler's disappearance and the recovery of Mettler's truck by his family, they had seen Baldado in possession of the truck.  Two witnesses observed blood in the back of the truck.  Baldado told one witness that he had recently caught a pig and told the other witness that the blood was from fishing.  After Mettler's disappearance, Baldado attempted to use or permitted others to use Mettler's VISA card; attempted to cash a check purportedly signed by Mettler, which the credit union refused to cash due to concerns about the signature; and used a check purportedly signed by Mettler to pay for a stereo system for a Toyota truck he said he had just purchased.

On November 14, 2003, Mettler's body was found by beach goers under a mattress box spring, wrapped in a black material used for plants, near a surf spot.  An autopsy indicated that Mettler died of three gunshot wounds to the head.  A rolled towel with electrical tape around it was found near the body.

According to a forensic science expert, the towel had been over the muzzle of the firearm when the shots were fired and had served to muffle the sound of the gunshots. The towel had blood on one side, soot from the muzzle of a gun on the other, and holes which indicated three shots had been fired. Baldado's fingerprints matched those found on the underside of the electrical tape.

B.

Between September 19, 2003 and November 20, 2003, Baldado gave numerous recorded statements to the police that were admitted at trial. Plaintiff-Appellee State of Hawai'i (State) introduced Miranda-rights waivers signed by Baldado in connection with these recorded statements. Transcripts of these recorded statements were also introduced at trial. Detective William Souther (Detective Souther) participated in or witnessed all of the recorded statements introduced at trial, but arrived after the interview had begun for one of the statements. Detective Souther conducted the first several interviews and Detective Wayne Keala Young (Detective Young) conducted the last three interviews. Detective Souther monitored the last two interviews conducted by Detective Young from an adjoining equipment room from which Detective Souther could see into the interview room and hear the audio of the interview. Detective Young died in 2004, before Baldado was brought to trial.

During both the interviews conducted by Detective Souther and the interviews conducted by Detective Young, Baldado said that he had been present when a person named "Pat" shot Mettler. However, Baldado gave conflicting details on how Mettler had been shot and what Baldado had done after the shooting. Detective Souther was not able to find any person named "Pat" as described by Baldado.

Prior to trial, the Circuit Court held a hearing on the motion of the State to determine the voluntariness of the statements Baldado had made to the police. The Circuit Court ruled that Baldado's recorded statements, including the

4

statements made to Detective Young that were introduced at trial, were voluntary.  In support of its ruling, the Circuit Court cited the evidence presented by the State, which included Detective Souther's testimony, as well as its own observation and review of the video and audio taped interview statements.

II.

A.

After the State rested, Baldado decided not to put on any evidence.  After closing arguments, the Circuit Court advised the three alternate jurors:

> At this time I am going to excuse you, but not discharge you.  What that means is that you folks will not be coming back to court to deliberate unless for some reason one of the remaining twelve jurors is unable to complete deliberation.

After discussing how the notebooks of the alternate and deliberating jurors would be handled, the Circuit Court stated:

> With that, please keep an open mind in this case until you begin deliberations.  Do not discuss this case with anyone except when you are together as a group and do not allow anyone to discuss the case with you.  Please do not talk to the defendant, the lawyers, or any of the witnesses, and do not investigate the case in any way.  Also do not read or listen to any media accounts of this case if there are any.  Your decision in this case must be based exclusively on the evidence that you have received in this courtroom and on the Court's jury instructions.
>
> With that, you are excused.  And you will return to the jury room tomorrow morning.

The jury began its deliberations on Friday, October 31, 2008.  At 2:01 p.m., the Circuit Court filed Jury Question No. 1, which stated: "We request Detective William G. Souther 1st testimony on 10/15/08."  A short time later, the Circuit Court filed a written response, which stated: "You are to rely upon your memories of the evidence.  If you are interested in a specific portion of testimony, however, please narrow your request and it will be considered."

Later that afternoon, at 2:47 p.m., the Circuit Court filed Jury Question No. 2, which stated: "We are requesting Det. William G. Souther testimony regarding visit to plumeria farm on

9/10/03. We believe testimony was given on 10/15/08." The Circuit Court determined that the requested testimony was actually given on October 16, 2008. The parties disputed what portion of the testimony should be read back to the jury, and the Circuit Court reserved ruling until the court reporter could prepare a transcript of the testimony. The Circuit Court called the jurors into court and informed them that it had located the requested testimony, but that it "will take us some time to put that together in a form that can be read back to you." Because the jury's trial schedule had been Tuesday through Friday and the following Tuesday was a holiday, the Circuit Court gave the jury the option of resuming deliberations on the following Monday or Wednesday. The record indicates that the jury did not resume deliberations until the following Wednesday, November 5, 2008.

After reviewing the transcripts of Detective Souther's testimony, the Circuit Court determined that the transcripts were not clear and that it would be difficult to comply with the jury's request in a non-prejudicial manner. Accordingly, on November 5, 2008, at 10:22 a.m., the Circuit Court filed its response to Jury Question No. 2 as follows: "The Court and the parties have evaluated your request in an attempt to isolate the testimony sought. The Court has ruled that you should rely upon your memories of the evidence."

Later that day, at 2:47 p.m., the Circuit Court filed Jury Question No. 3, which stated: "We as the jury can not come to a unanimous decision, what do we do now?" At 3:20 p.m., the Circuit Court reconvened to address the jury on Jury Question No. 3. The Circuit Court noted that while the trial had consumed about five-weeks, the jury had only been deliberating for "about a day and a half total time." The Circuit Court asked the jury to continue to deliberate and read back the following instruction:

> A verdict must represent the considered judgment of each juror. And in order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous. Each of you must decide the

case for yourself.  But it is your duty to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violating your individual judgment.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous.  But do not surrender your honest belief as to the weight or effect of evidence for the mere purpose of returning a verdict.  With that, I'm going to ask that you return to deliberation.

On Thursday, November 6, 2008, at 10:32 a.m., the Circuit Court filed Jury Question No. 4, which stated: "Can we get all 11 copies of the transcript from the videos.  Audio quality on the video is bad."  The Circuit Court filed its response at 11:55 a.m. that day.  The Circuit Court granted the jury's request and instructed the jurors that they were to review the transcripts only in conjunction with their review of the video and audio recordings.

B.

On Friday, November 7, 2008, at 11:17 a.m., the Circuit Court filed Jury Question No. 5, which stated: "Juror #3 who is pregnant has been in pain & is concerned about not having any movement of the child over the past 24 hours.  She has contacted her doctor & they have suggested she go into emergency room at K.K.C.  We request an alternate juror."  Baldado objected to replacing Juror # 3 with an alternate juror, arguing that the replacement would violating HRPP Rule 24.  Juror #3 was taken to the hospital.  The Circuit Court advised the remaining jurors that they could not deliberate without a full twelve-member jury.  The Circuit Court excused the jury at 1:19 p.m. and directed them to return on Wednesday, November 12, 2008.

In the meantime, on Monday, November 10, 2008, the Circuit Court held a hearing to question the three alternate jurors to determine whether they were "still qualified to sit as a juror in [the] case."  The first alternate juror, who

eventually was substituted for Juror #3, was questioned by the Circuit Court as follows:

> THE COURT: I am going to remind you that you are still under oath as a juror.
>
> You were asked to come back to court today because it may be necessary for the Court to seat an alternate juror on Wednesday. So you've been asked to come back to court today so that we can talk with you to determine whether or not you are still qualified to sit as a juror in this case. Okay?
>
> [ALTERNATE JUROR]: Yes.
>
> THE COURT: Okay. So I'm going to be asking you some questions to aid us in that decision. All right?
>
> [ALTERNATE JUROR]: Yes.
>
> THE COURT: Okay. Have you read or heard anything about this case since being excused?
>
> [ALTERNATE JUROR]: No.
>
> THE COURT: Have you discussed this case with anyone?
>
> [ALTERNATE JUROR]: No.
>
> THE COURT: If you are seated on Wednesday, there will be a requirement that jury deliberations begin anew. So, your fellow jurors have deliberated for several days. Would you be able to hold your fellow jurors to the requirement that they start all over with you?
>
> [ALTERNATE JUROR]: Yeah. Yes.
>
> THE COURT: Okay. Have you formed any opinions about this case?
>
> [ALTERNATE JUROR]: Nothing.
>
> THE COURT: So do you believe that you could sit with your fellow jurors and discuss this case, and then form an opinion about it?
>
> [ALTERNATE JUROR]: Yeah.

In response to Baldado's request, the Circuit Court asked the following additional questions:

> THE COURT: [Alternate Juror], during the jury selection process there were questions asked -- and I can't remember if it was asked specifically of you, but it was asked of other jurors -- whether they would be able to hold to their opinions if convinced that their opinion was correct. Do you believe that you could still do that?
>
> [ALTERNATE JUROR]: Oh, yes.

> THE COURT: Okay. Do you also believe that you could listen to the opinions of other jurors, and if convinced that your opinion was in error, change your opinion?
>
> [ALTERNATE JUROR]: No problem with that.
>
> THE COURT: Okay. You can do both?
>
> [ALTERNATE JUROR]: Yes.
>
> THE COURT: And this is just sort of a follow-up to one of the questions. If you had a question about -- that you wanted to review a piece of evidence, for example, that was introduced, and the rest of the jurors said, 'Oh, we already talked about that,' would you still be able to say, 'Well, I haven't been able to look at that, and it's important to me that I be able to evaluate that evidence'? Do you think you could stand up for yourself for that?
>
> [ALTERNATE JUROR]: Oh yeah. Yes.

The Circuit Court asked the parties if anything else was requested, and both sides responded no.

On Wednesday, November 12, 2008, after receiving information about Juror #3's medical condition from her doctor, Baldado and the State agreed that Juror #3 needed to be excused. Baldado, however, maintained his objection to replacing Juror #3 with an alternate juror based on HRPP Rule 24(c). The Circuit Court overruled Baldado's objection. The Circuit Court called in the jury and instructed the jury as follows:

> The Court has thanked and excused juror number 3 from further jury service in this case, and it has now become necessary to seat an alternate juror.
>
> Once we seat an alternate juror, the jury is to begin jury deliberations again. You are instructed to disregard your prior deliberations and to start your deliberations anew; in other words, you are to start your consideration of the evidence and the law as if previous deliberations have not occurred. We will be directing you to go back to the jury deliberation room to select a foreperson and to start over.
>
> Is there anyone who cannot follow these instructions? The record will reflect no response.

The Circuit Court then called in the first alternate juror, seated him on the jury, and then further instructed the jury as follows:

> [Alternate Juror], this Court has now seated you as juror number 3 in this case.

9

>As I stated a moment ago, ladies and gentlemen of the jury, an alternate juror has now been seated as a juror. In addition to the instructions that you were previously provided in this case, you are now instructed to disregard your prior deliberations in this case and to start your deliberations anew. In other words, you are to start your consideration of the evidence and law of this case as if previous deliberations have not occurred.

The Circuit Court then reread portions of the previously-given jury instructions that directed the jurors to elect a foreperson upon retiring to the jury room; advised the jurors that they "may take such time as you feel necessary for your deliberations"; and instructed them about completing the verdict form, communicating with the court, limiting their consideration to evidence presented in the case, and following certain rules while not deliberating. The Circuit Court then excused the jury "to resume deliberations." Baldado's counsel brought to the Circuit Court's attention that it had used the term "resume deliberations" when excusing the jury. The Circuit Court recalled the jury and again emphasized to the jury that it was to begin deliberations anew, stating:

>It was pointed out to me that as I was instructing you to leave the courtroom, I used the word 'resume' jury deliberation, when, in fact, what you should be doing is 'beginning' deliberation anew. So that there is no misunderstanding, you are to start over. So if I misled anybody with the words that I used when I excused you before, you are now excused to begin deliberations.

The jury exited the courtroom to begin deliberations at approximately 9:31 a.m.

Later that day, at 2:58 p.m., the Circuit Court reconvened and informed Baldado and the State that the jury had reached a verdict. The jury found Baldado guilty as charged of second degree murder. The Circuit Court subsequently entered its Judgment on January 8, 2009, and this appeal followed.

DISCUSSION

I.

Baldado argues that allowing an alternate juror to replace a pregnant juror who became sick (Juror #3) after the jury began deliberating violated HRPP Rule 24(c) and did not

10

constitute harmless error. HRPP Rule 24(c) provides in pertinent part that "alternate jurors . . . shall . . . replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict." We agree that the substitution of the alternate juror for Juror #3 violated HRPP Rule 24(c) because the substitution took place after the jury had already "retire[d] to consider its verdict." We conclude, however, that this violation was harmless beyond a reasonable doubt.

A.

In State v. Wideman, 69 Haw. 268, 739 P.2d 931 (1987), the Hawai'i Supreme Court applied the harmless error analysis to a violation HRPP Rule 24(c). In Wideman, the trial court substituted an alternate juror for a juror who was unable to continue deliberations because of illness, over the defendant's objection that the ill juror should have been allowed to return when able. Id. at 269, 739 P.2d at 931-32. The jury had indicated to the court that it was deadlocked both before and after the substitution. Id. at 269, 739 P.2d at 932.

In holding that the substitution violated HRPP Rule 24(c), the supreme court explained:

> When an alternate juror is called to replace a juror after the jury had been deliberating, the alternate juror is subject to potential undue pressure from the original jury members to reach a conclusion they may have agreed upon during their prior deliberations. See U.S. v. Lamb, 529 F.2d 1153, 1156 (9th Cir.1975). Because the trial judge did not instruct the new jury to begin its deliberations anew, the probability of undue pressure was further enhanced. Cf. id.

Id. at 269, 739 P.2d at 932. The court rejected the State's claim that the violation of HRPP Rule 24(c) was harmless error, stating:

> In view of the conflicting testimony between Wideman and the victim, the jury being deadlocked during much of its deliberations, and the lack of an instruction to the new jury to begin its deliberations anew, we cannot say the HRPP

11

> Rule 24(c) violation was harmless beyond a reasonable doubt. State v. Domingo, 69 Haw. 68, 733 P.2d 690 (1987).

Id.

B.

Baldado's case is distinguishable from Wideman. Unlike in Wideman, the Circuit Court took great pains to ensure that both the alternate juror and the original jurors understood, and would comply with, the requirement that the jury must begin its deliberations anew after the alternate juror was substituted. The alternate juror assured the Circuit Court and the parties "under oath as a juror" that he would be able to hold his fellow jurors to the requirement that they begin deliberations anew. The Circuit Court emphasized to the original jurors the importance of their obligation to disregard their prior deliberations and to start deliberating anew by stating these instructions both immediately before and after replacing Juror #3 with the alternate juror. When questioned by the Circuit Court, none of the original jurors indicated that they could not follow the Circuit Court's instructions. The Circuit Court further emphasized the importance of the jurors' beginning their deliberations anew by recalling the jurors and repeating this requirement to avoid any possibility that its excusing them to "resume deliberations" might be misconstrued.

"[J]urors are presumed to follow the court's instructions[.]" State v. Haanio, 94 Hawaiʻi 405, 415-16, 16 P.3d 246, 256-57 (2001). We conclude that the Circuit Court's repeated instructions served to remove any reasonable possibility that the jurors would not begin their deliberations anew or that the alternate juror would be subject or would succumb to potential undue pressure from the original jurors to reach conclusions they had already agreed upon during their prior deliberations.

Moreover, unlike in Wideman, there was no conflict between the State's case and the defense's case, since Baldado rested without presenting evidence. While the jury expressed its

inability to reach a unanimous verdict early in the deliberations, it appeared to move forward and requested additional copies of the transcripts of Baldado's recorded statements after the Circuit Court instructed the jury to continue its deliberations. Baldado's jury did not indicate it was deadlocked both before and after the substitution of the alternate juror or appear to be deadlocked during much of its deliberations as was the case in Wideman. We also note that the jury's deliberations were sporadic before the alternate juror was substituted. The jury spent much of this time awaiting guidance from the Circuit Court on the availability of trial transcripts; in recess due to weekends, holidays, and an agreed-upon day off; and unable to deliberate due to the unavailability of Juror #3. Under the circumstances of this case, we conclude that the violation of HRPP Rule 24(c) was harmless and did not affect Baldado's substantial rights.

II.

Relying on Crawford v. Washington, 541 U.S. 36 (2004), Baldado argues that the Circuit Court violated his constitutional right to confront witnesses at trial by admitting recorded statements Baldado made to Detective Young, who died before trial. In particular, Baldado argues that Detective Young's testimony was necessary to establish that Baldado's recorded statements were voluntary and that Detective Young's death precluded the State from establishing the voluntariness of Baldado's statements. We conclude that Baldado's reliance on Crawford is misplaced and that his arguments are without merit.

In Crawford, the United States Supreme Court held that under the Confrontation Clause of the Sixth Amendment, testimonial hearsay is inadmissible unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. Crawford, 541 U.S. at 59. In explaining the limits of its holding, the Supreme Court stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the

truth of the matter asserted." <u>Id.</u> at 59 n.9 (citing <u>Tennessee v. Street</u>, 471 U.S. 409 (1985)).[3/]

With respect to Baldado's recorded statements, it is Baldado, not Detective Young, who is the relevant "declarant" and whose statements are being offered for their truth. The questions or statements of Detective Young are not hearsay because they are not offered for their truth, but only to provide context for Baldado's statements. <u>See</u> <u>United States v. Hendricks</u>, 395 F.3d 173, 183-84 (3rd Cir. 2005) (holding that the statements of a confidential informant made in recorded conversations with a defendant, which place the defendant's statements into context, are not hearsay and are admissible); <u>Turner v. Commonwealth</u>, 248 S.W.3d 543. 545-46 (Ky. 2008) (same). Thus, Detective Young's unavailability due to his death does not bar the admission of the recorded statements Baldado made in interviews conducted by Detective Young.

The same basic analysis also applies to Baldado's arguments regarding the voluntariness of his statements. The statements made by Detective Young in advising Baldado of his <u>Miranda</u> rights were not offered for the truth of the matter asserted, but rather were simply offered to show that the statements were made. <u>See</u> <u>Washington v. State</u>, 568 P.2d 301, 308-09 (Okla. Crim. App. 1977) (concluding that <u>Miranda</u> warning was not hearsay because it was not offered to prove the truth of the matter asserted); <u>State v. McClain</u>, 551 P.2d 806, 807-08

---

[3/] In <u>Tennessee v. Street</u>, the Supreme Court held that the defendant's rights under the Confrontation Clause were not violated by the introduction of an accomplice's confession for the nonhearsay purpose of rebutting the defendant's claim that the defendant's confession was the coerced imitation of the accomplice's confession. <u>Street</u>, 471 U.S. at 411-14. At trial, a sheriff was permitted to read to the jury the confession of the accomplice, who did not testify. <u>Id.</u> at 411-12, 416. The Court noted that the accomplice's confession was not hearsay because it was not offered to prove the truth of the accomplice's assertions, but to show that the defendant's confession included different details than the accomplice's confession and thus had not been a coerced imitation of the accomplice's confession. <u>Id.</u> at 413-14. The Court concluded that "[t]he *nonhearsay* aspect of [the accomplice's] confession -- not to prove what happened at the murder scene but to prove what happened when [defendant] confessed -- raises no Confrontation Clause concerns. <u>Id.</u> at 414.

(Kan. 1976) (same). For example, Detective Young's statement to Baldado that Baldado had the right to remain silent was not offered to prove that Baldado had that right, but only to show that Detective Young had informed Baldado of that right, for purposes of evaluating whether Baldado had validly waived his rights. Because Detective Young's statements to Baldado in obtaining Baldado's waiver of Miranda rights were not hearsay, the introduction of evidence regarding Detective Young's advice-of-rights statements do not implicate Baldado's confrontation rights and were not barred by Crawford.

We also reject Baldado's related argument that Detective Young's death precluded the State from establishing that the statements Baldado made to Detective Young were voluntary. The State introduced ample evidence to support the Circuit Court's finding that Baldado's recorded statements admitted at trial, which were made during interviews by Detective Young, were voluntary. This included the waiver of rights forms signed by Baldado and the testimony of Detective Souther who participated in or monitored Detective Young's interviews. For the one interview that began before Detective Souther's arrival, Detective Souther testified that he reviewed the videotape of the advice of rights administered by Detective Young, which appeared to show that Baldado understood his rights, and also recognized Detective Young's handwriting on the advice-of-rights form. In addition, the Circuit Court reviewed the recorded statements themselves in concluding that Baldado's statements were voluntary.

If Baldado's argument were accepted, the prosecution would never be permitted to admit a defendant's recorded statements if the officer conducting the interview subsequently died or otherwise was unavailable to testify at trial, even if other evidence establishing the voluntariness of the statements was available. Baldado cites no authority to support this proposition. We also reject Baldado's claim that Detective Young's death prevented Baldado from offering evidence to show

15

that his statements were involuntary.  Baldado was free to present his own testimony to support such a claim.

CONCLUSION

We affirm the Judgment entered by the Circuit Court.

DATED:  Honolulu, Hawai'i, June 30, 2011.

On the briefs:

Vaughan S. Winborne Jr.
for Defendant-Appellant

Linda L. Walton
Deputy Prosecuting Attorney
County of Hawai'i
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge